423-0973 W.C. Farmland Foods Appellant by Matthew Brewer v. Illinois Workers' Compensation Comm'n et al., Veronica Cerna, Happily, by James LaFontaine Mr. Brewer, you may proceed. Yes, thank you, Your Honor. Can everyone hear me okay? Yes. Okay, thank you. My name is Matt Brewer. May it please the Court, I represent the appellant in this matter, Farmland Foods. Just to provide some quick kind of background information, the case was tried in September of 19. The arbitrator, Rose Sullivan, denied the petitioner's case for failure to prove accident causation. The case was appealed to the Commission. It was unanimously affirmed by the Commission. The petitioner, Veronica Cerna, then filed an appeal to the Circuit Court of Warren County, where Judge Standard then reversed the unanimous decision of the Commission. The case was remanded back to the Commission for a damages assessment. And just to briefly touch, kind of shift gears for a moment and touch base on the jurisdiction, I wanted to make sure I had it clear in my brief as to why I did what I did following Judge Standard's decision. I did not believe that Judge Standard's original remand order was a final and appealable order. I believe that it was interlocutory and that the case should have returned back to the Work Comp Commission before being appealed back up. That is why I did not file an appeal at the time. The Commission, following Judge Standard's order, was left with resolving both legal and factual issues regarding the bills, TTD, and whether or not permanency was owed. So I did not believe that these were just mere mathematical calculations. I believe that the Commission had to take a look at the evidence and determine what, if any, of these benefits and the extent of these benefits were to be awarded. And so that is why I did that. And namely, just if you take even a look at Dr. Shire's narrative report, where he actually says that I don't believe that there's been any permanent injury as a result of this regarding her left shoulder. So just jurisdictionally, that's why it went back down. Commissioner Mathis, then accompanied by the remainder of his panel, issued their remand order, which I then appealed back up to the Circuit Court of Warren County and filed an appeal before this Honorable Court. And that judge, Mr. Brewer, was who reviewed the remand? That was Judge Baber, I believe, who did the remand order, and that was in 2023. Yes, thank you. You're welcome. But moving to my primary argument here, no surprise. I don't believe that the commission's original decision was against the manifest weight of the evidence. And I don't believe that there was enough evidence for the Circuit Court for Warren County in December of 2021 to reverse it, given our applicable standard of review, which is the manifest weight of the evidence. As I cite in my brief, and as I'm sure this panel hears very often, under that standard, the court can only reverse the commission's decision if, after reviewing the evidence in the light most favorable to the commission, it finds that no rational trier of fact would have found the same way, which I kind of interpret that as, we almost have to find that all three members of the commission in their original decision were irrational in their findings. And I just don't believe that is the case here. Furthermore, you know, we talk about, you know, the commission, you know, they have sole province to judge witness credibility, draw reasonable inferences from the testimony, determine weight to be given, which are very, very important things. It makes, at least from my reading, when we get up to this stage, the manifest weight of the evidence is an extremely difficult standard to overcome. And, you know, with that, as I cite as well, you know, you talk about the fact that the Circuit Court, you know, Warren County may have drawn different inferences or, you know, solve things a little bit different. That doesn't become relevant in the context of what the commission found, because they can't reject or disregard permissible inferences drawn by the commission. They can't substitute their own judgment under the standard of review that we have. And I believe that's what happened here when Warren County had reversed the commission's original decision. So moving to the real basis here, the arbitrator and the commission originally denied this claim really on three kind of premises. You've got number one, the petitioner they believe lacked credibility. Number two, they found that they did not believe that the petitioner performed any at or above shoulder work. And then number three, they chose they believe that Dr. Lee's opinions were more persuasive than those of Dr. Shire. Starting with the credibility issue, there's not a whole lot to touch base here on. I mean, the arbitrator is pretty concise. The commission obviously affirmed it in its entirety. Originally, she denied prior left shoulder issues other than this repetitive trauma sort of theory that she was pursuing a trial. That was clearly incorrect. She told her provider she had had a fall before long before her manifestation date and that her left shoulder had never been the same. That's on page 819 of the record. On cross-examination at trial, I tried to present her with numerous instances where I thought she was being dishonest, not only the prior injuries, her complaints and the history that she had given to providers, even touching base at times on her motive for filing the application for adjustment. And, you know, as I was reviewing this in preparation for today, I'm. I almost had a question is, is where is there any sort of rehabilitation attempt in the record to help petitioners credibility? You know, once she was presented with these issues that I think are glaring and the arbitrator and the commission clearly had a very difficult time rationale or excuse me, rationalizing. In my opinion, she's not a credible witness. But let's move to the issue of of the overhead work, because I think that's the big key here. And with that, I wanted to point the court's direction to the manifestation date. In this case, it's repetitive trauma. So we have a manifestation date. October 21st, 2014. That's the date that she goes to occupational health. She's got various complaints, including her left shoulder. She says she didn't have any sort of new injury, but she does discuss her job and the job at that time that she's discussing in that note is the feed line position. And that's on page 760 of the transcript of the court's record. So she says she's been doing the feed line job for about four years now. It's important to note that she tells occupational health. The feed line job is not a heavy job. She and both Mr. Boland at trial testified that all the work on the feed line was done at waist level. And Mr. Boland confirmed there's no lifting of the meat. She's essentially trimming the meat and moving it. It doesn't actually get lifted off the conveyor belt in that specific position, which is the job that she's working at the time. She presents her complaint and what is her manifestation date in this case. And that ties very importantly into Dr. Shire's testimony and the basis of his causation opinion. And he really kind of has three and that she does heavy, repetitive, and overhead work. Now, he testifies to that in his deposition. That's 394 and 395 of the transcript. Now, he says abduction on those pages. But if you fast forward to page 402, he makes it clear that when he's saying abduction, as far as one of these requirements for her jobs, in order to make the case compensable, he means overhead. And that's on page 402. So now we have this. Now we have three basic kind of requirements that Shire has that her job or jobs need to have to make her condition compensable to her work. And the feedline position, the one she's working at the time that she initially seeks care for her left shoulder, everybody agrees is not overhead. And even she's telling the providers it's not heavy work. So the feedline job, in my opinion, cannot be the cause of her left shoulder. But let's move to the real issue or the allegation that she makes of what jobs do, in her opinion, include overhead or add or above shoulder work. And that's the bottoms and tops jobs. And again, we go back to Shire's requirements, heavy, repetitive, and overhead. There's no doubt, and I will not argue in front of this court because it wouldn't make any sense. The tops and bottom job are clearly repetitive. There's no doubt about that. So she's going to meet that requirement under Shire's requirements. But there's also no doubt that these jobs are very light. And if you look, I think I wrote down page 141 of the court's record, which is her in-trial testimony. She even says that the meat that she's moving or that she's manipulating in the tops and bottoms jobs is, quote, very light. And she even kind of demonstrates how small the pieces of meat were. And you take that in combination with Boland's testimony that the tops and bottoms job involves very light weights. And this is something that admittedly the weight of what she's moving that I have not discussed enough thus far. And that's absolutely have been my fault. But with that in mind, even if she could meet Dr. Shire's requirement that she's lifting this meat in the tops and bottoms jobs and it is overhead, she can't meet his requirement that it's heavy. And her testimony at trial said it's very, very light. So we're certainly not going to concede that she's doing work overhead. But even if it were to be found that the work wasn't heavy, it still doesn't meet the other requirements per Shire. But turning to that and what she actually said, you know, she told Dr. Lee, that's another thing I've hinted on or I've discussed in my brief. Dr. Lee asked her what type of work she did and what level she worked at. Dr. Lee said that she told him waist level. Dr. Lee, as I understand it, had her demonstrate what she was doing for the respondent in her various positions, and she's describing waist level work. And it's no surprise that when we get to trial, she's testifying that I had my work involved overhead work because that's the only way that she could establish compensability for her claim. You take that with, you know, Mr. Bowen's testimony at the time of trial, that there's no overhead work. And I don't think there's any there's no doubt that she's going to be working at a higher level. She's going to be lifting the meat higher in relation to her body than the respondent's witness because he's taller than her. But I don't think there's any evidence that it actually is going overhead to meet Shire's requirements. I just, you know, in preparation for today, too, I also went back and read, you know, on my original, the original appearance that we had in front of Warren County. I just I have a hard time seeing it any other way that, you know, the circuit court was just trying to insert their own judgment on a combination of witness credibility and the weight of various evidence that was being given. It just I just don't see it any other way. You turn to the third kind of aspect, which was which doctor is more persuasive. You know, it's my opinion that these repetitive trauma cases understanding of the job duties is extraordinarily vital that I tell my clients that makes or breaks the case. What are the job duties and who has a good understanding of them? Shire, I don't think had much of an understanding. I mean, that's why I kind of got short with him on crosses. I asked him, I said, what is your what is your understanding? And I think he had a three word answer. It was she cut meat. Do you want to expound on that? No, not really. He didn't really have any other information. And his, you know, the basis of his opinions was, in my mind, based upon his assumptions that she did heavy repetitive overhead work, which I don't believe the evidence actually shows that. Shire didn't know about this fall that's in her records where she said she fell injured her left shoulder and was never the same. He hadn't really reviewed any outside records. And then if you take that into combination, when she initially presents to Shire, she didn't have any left shoulder complaints. And that was almost a couple of days, I believe, after she was terminated. And then we fast forward four months later. So she hasn't been doing this, these jobs that she's claiming is the cause of her issues. And now four months after that, she has eight out of 10 left shoulder pain when she presents to Shire. But when she saw him just a couple of days after her employment ended, she had no shoulder complaints. Another thing that she was not honest about at trial. The only other thing I mean, Dr. Lee, I believe, did have a better understanding of what she did. I think that his opinions are more consistent with the evidence that's in the record. I think that the arbitrator in the commission's original findings, as far as who was more persuasive from doctor's testimony perspective, I believe that that was certainly more consistent with the evidence than what we had on the remand or the reversal order from the circuit court. So short of there being any questions from the panel, I mean, obviously, my request is that this court reverse Warren County's original decision, a reversing decision from December of 2021 and reinstate the commission's original unanimous denial of the petitioner's case. Questions from the court? No. Thank you very much. Thank you, Mr. Brewer. Mr. LaFont, you may reply. Thank you, Justice Holdrich. James LaFont on behalf of Veronica Serna, the appellee in this matter. If it may please the court and counsel, your honors, I think that Mr. Brewer indicated the correct standard of review, which is against the manifest way to the evidence. That's a situation where we look to see whether the record contains sufficient evidence to support the circuit court's determination. And if so, this court should affirm. I do believe that there is plenty of evidence to support the circuit court's determination in this case. And I think it really does come down to whether or not Veronica Serna did overhead or over shoulder work at her job working at a at a meat processing plant for 14 years. And the answer to that is a simple yes. She testified that she worked overhead during that 14 year period. She testified that she had to cut meat and move the meat then to other conveyor belts and that all of that involved overhead lifting for her. The meat weighed different amounts. Some meat was between, I think, three to six pounds. Other pieces or cuts of meat were up to 20 to 25 pounds. But I think that the really big issue here is Mr. Scott Bolin, who was her supervisor, testified at the arbitration and he demonstrated what's being done on the line because he works there, he's done those jobs, and he was asked to demonstrate. And when he asked, he showed the court that his arm was extended straight out from his shoulder. That's what he showed the arbitrator, showed the court, that that's where the level of work is at. But for Mr. Bolin, who's five foot ten inches tall. That's important because Veronica Serna is only five foot two. If Ms. Serna is going to reach the same level as Mr. Bolin at shoulder height, she, by definition, has to raise her hand up. She's five foot two. He's five foot ten. She has to put the meat from the lower conveyor belt up to a higher conveyor belt. And she did that for 14 years. Now, was there testimony, Mr. LaFonte, that she used a stool which would level the height closer to Mr. Bolin? I'm sorry, Judge? I thought there was testimony that she used a stool. Was that in the same process that might level the height? No, Judge, I'm not familiar with testimony regarding using a stool, and I don't believe that she was using a stool for 14 years on a meat processing line. I don't believe that that's part of the record. She was standing on the floor for the majority of the time that she was doing her work, and she had to lift above her head repeatedly. And sometimes there were situations where the processing line got backed up, and then she'd be dealing with multiple pieces of ham weighing 20 to 25 pounds each and have to deal with that. And she'd be using her left arm to hold stuff back is what her testimony was, I believe. What was the first date after October 24, 2014, that she reported a left shoulder injury? After October, Judge, she treated for quite a while in 2014 with complaints of shoulder pain. And what's the first date she complained of shoulder pain after October 24, 2014? I believe that she had seen other doctors or other nurses within the group, but the first time that I've got noted is October 22, 2016. She sees Mary Lou Johnson, a nurse practitioner, complaining of left shoulder pain. And she'd said it was nine out of 10 at its worst. She was unable to sleep, and she had had the pain for about three years in her left shoulder. What brought all of this up to a head for her was after working there for 14 years and doing her job every day, day in and day out, one of her supervisors asked her to move to, I think, the hand bone line, the TOPS department. She knew that that position caused her a lot of pain because it was, I think, heavier and repeated overhead lifting. And she refused. She talked to the supervisor. They sent her back down to her original position. The next day, the same thing happened. That time, the supervisor wasn't as lenient and basically said, we're going to give you a three-day suspension for refusing to move to that line. That's where it went. And so that next day, she saw Mary Lou Johnson. Mary Lou Johnson documented that she was complaining of left shoulder pain. She actually placed her on a restriction of no lifting above the shoulder and no lifting greater than five pounds. Now, there would be no reason to give her that restriction if she didn't do that in her job. But that was part of her job, was to lift overhead and to lift meat that was more than five pounds repetitively throughout the day. So, you know, the issue is that Bollinger showed us that the work was above her shoulder level, above over her head. She testified that was the way. Dr. Shire didn't lay down any requirements, but he did say the things that supported his position was the fact that she was doing repeated overhead lifting of heavy pieces of meat. So for 14 years. He also testified that he had actually been to the meat processing plant himself, unlike Dr. Lee, and that he saw what those people did at that plant. And he knew that it was really tough, hard work. So he was supportive that this was causally connected due to repetitive trauma over the course of 14 years there at the meat processing plant. So let me go back for just a moment, Justice Holder, to ask you a question about a step stool. Maybe I can refresh or we can refresh your recollection. There is testimony from the claimant that she used a step stool to perform some of her duties, which could have brought her closer to height with this bullion. Do you recall that? I do not. I'm sorry. I do not. May I ask a question? Counsel, you said we should direct our analysis to whether the circuit court's decision is against the manifest way to the evidence. Didn't you mean the original workman's compensation, the commission's ruling, their original ruling? I do, Judge. This is actually a review of the commission's ruling. You're right. The commission's original ruling. Well, I believe, yes, it is the commission's original ruling. Well, thank you. Your brief said otherwise, and I thought I heard you say otherwise today, but thank you. Further questions? Yeah, my view of the record seems to indicate that the first time she complained of shoulder pain was October 26th of 2016. Is that correct? Nurse Practitioner Johnson's note? Judge, I've got October 22nd of 2016. Yeah, October 22nd of 2016. Yes, sir. That's the first time after the 2014 complaints. So it's two years after the 2014 manifestation day that she actually complained of a lot of shoulder injury, and that was, I guess, immediately after she was suspended? That's correct. Okay. All right. Yeah, I mean, in this case, you know, you've got people that are working these hard jobs out in West Central Illinois, and they know that if they file a workers' compensation claim, they're going to get pushback from their employer. So they just work in pain and deal with it, and she did that up until the point that she couldn't do the job anymore, and they were going to terminate her or they had suspended her at that point in time. And then she went back to the doctor to make the complaints about the shoulder pain. You know, subsequently, they did find an injury to the left shoulder, so she wasn't making this up. And they did find that once they finally did an MRI, and the treating orthopedic surgeon said it was surgical and performed surgery. So I would say, Judge, that, you know, Ms. Serna was trying to deal with the issues she had in front of her and trying to live her life and work through the pain that she had. But when it came to the point that she couldn't do her job and that was an issue, she certainly reported it and then ended up having a shoulder surgery as a result. If there are any other questions, I'm happy to answer them. Otherwise, I'll rest on the brief and my arguments. Thank you. Yeah, I see none. Thank you, Mr. LaFonte. Mr. Brewer, you may reply. Yes, thank you, Your Honor. Just a couple of very, very brief things. Yeah, we've got the manifestation date and we've got our original treatment in October of 2014. And yes, then there's some conservative care where she said that her symptoms were essentially resolved. And when she does go back, and it's this October 22nd of 2016 visit, I think it's page 819 of the record. And that is the note where she talks about having this slip and fall three or four years earlier and that her shoulder hasn't been the same since. And I think that's important. And then obviously we have all this other kind of ancillary discussion regarding changing her jobs and the kind of disputes that she was having in that regard. But that's just another factor. And then shortly thereafter, when she sees Dr. Shire, then she makes no shoulder complaints again. And then we've got months and months to go by and now we have shoulder complaints again. But outside of that, and I'm glad that Your Honor did bring up the testimony regarding the stool, which is something that I overlooked in my notes, and I apologize for that. But short of any other questions, I have nothing further to add, and thank you for your time. Questions? No? Okay, thank you. Thank you, counsel, both for your arguments in this matter this morning. It will be taken under advisement and a written disposition shall issue. And the clerk of our court will escort you out of our remote courtroom at this time. Thank you.